Good morning, I'm Gerard Smolin, Jr., and I'm here on behalf of RQ Construction. I'm going to make my best effort to try to reserve approximately seven minutes worth of time to respond to the comments made by Mr. Galea. May it please the Court, the first issue that I'm going to address goes to the point that the District Court committed legal error when it concluded that Accelerated Electric was entitled to lost profits on the entire BEQ 856 project. And with all due respect to the District Court, the District Court improperly ignored the legal effect on the 856 transaction of the undisputed facts and the undisputed conduct and prior course of conduct of the parties with respect to virtually identical contracts. Our main point is that it's undisputed in the facts that there were prior contracts. And I'll go through those specific facts in a moment. But that was a consistent course of conduct and dealing. And under traditional rules of contract interpretation, which are to be reviewed de novo, the point is established that accelerated rights and remedies for a breach of a contract predicated on a letter of intent can be no greater than its rights and remedies had it received the contract that the parties were contemplating when it got the letter of intent. And that contract and the prior four contracts, and in fact the contract that was ultimately given to the subcontract did the work, was all the same and contained a termination for convenience provision in it. Let's suppose we deny your termination for convenience argument and find that it is only triggered when the government terminates the contract. Can you now turn to the question of why we should find that the District Court committed error, which is clearly erroneous in finding after a bench trial that the parties intended to contract and that the letter of intent embodied all of the necessary factual elements that the court needs to find in order to make that legal determination? There would be two parts to the answer. The first part to the answer is directed directly to the question of whether the government, whether the termination for convenience provision that was in the contract required that we are seeking to have enforced, required prior termination by the government. I understand. And for purposes of my hypothetical, I assume you lose on that first part. Okay. I don't buy that. I'm up for two. The second reason is the object of giving of contract is to search for the objective intent of the parties with respect to the promises that were made and the promises to be enforced. Okay. We understand basic 1L contract purposes, but the problem you face, as I see it, Mr. Smolin, is that you've got a bench trial at which the district judge is the finder of fact, and she heard all the testimony, and she made the factual determination that there were facts sufficient to support each element of the contract. So it seems to me that in reviewing her decision, don't we have to find that the evidence simply does not support the determination that she made first as a matter of fact and then ultimately as a matter of law? It is true that it is a question of fact if we're dealing with the determination of what solely the documents that are the offer and the acceptance and whether those meet the criteria of the standards for breach of contract claim. That is a question of fact. It's clearly erroneous in this case because the offer was contingent upon a written contract. And the letter of intent in its first sentence says. It is our present intention, clearly not a commitment to the offer. And all that was in those provisions were those two documents which set the parameters for this discussion between our queue and accelerated. Or that we're going to talk. Okay, but we're not reviewing this on summary judgment. We're reviewing this on the basis of findings of fact made by the district court in a bench trial, and she made those factual determinations adverse to you. And I'm still waiting for an answer to my question. Why should we reverse her? I mean, you're basically telling me we'll look at the terms of the documents, but don't we have to also consider the fact that she heard the testimony of the key witnesses? The difference that I see and that we presented there, and which I believe is now before the court is the issue of de novo review, because she left out an element in her determination, factually, and now a legal element that she was required to consider. And she left that out factually so that she never even made a factual finding with respect to an essential element of the claim, and that that needs to be reviewed de novo. And that factual element was the clear course of conduct of the parties, which gives rise to the context in which they are going to be able to make a determination factually as to the objective intent of the parties. I don't understand why that wouldn't be inherent in her listening to the testimony of the witnesses, looking at the documents, and trying to determine what they meant. I understand your argument that she erred as a matter of law in reaching that conclusion, but how can I as an appellate judge or we as an appellate panel declare that she was wrong if we are satisfied that there's enough evidence from which a reasonable fact finder could make that determination? You obviously and understandably disagree with her determination, but I can't look at this record and say that there wasn't enough evidence from which. The issue, as we have seen it and have identified it in our papers, is that she made the factual issue of the course of conduct of these parties on the four prior occasions. The anomaly of this case is that on the four prior occasions, there was a termination for convenience provision in the contract, which specifically said that you just we can terminate for your convenience and you're just going to get paid for the work that you're going to do. The contract that was ultimately given to the other subcontractor was the same contract, which basically said you're going to get paid for the work that you're going to do. And if you complete the contract, you'll get paid for the work that you're going to complete. If you don't complete the contract, you're going to get paid up to the work that you're going to do. The anomaly is that the ruling in this particular case is based on two sheets of paper that we're going to, and the parties knew we're going to include those terms, but didn't have those terms in it. Now says, all right, we're going to give because we terminated them before we issued the letter of intent. I mean, before we issued the contract. But after we issued a letter of intent, we're not going to give them the remedies for the entire contract. Had we just gone through the subterfuge, the legally superfluous step of handing out the contract, having him sign it, terminating it for convenience, we wouldn't be here. What do we do with the fact that your client asked Accelerated to basically start the work before tendering the contract? Item number two, the. And that custom had been done in the other four contracts. That Accelerated would begin a mobilization effort beforehand. That is traditional in construction circumstances. And it is also traditional. You just get paid for the mobilization work. Can part performance create a contract or does it just take the contract outside the statute of fraud? I think it just can you make it. Can you make an offer anticipating a contract and have the offeree simply start work and thereby create a contract where there is yet to be a meeting in the mind? And it depends if this was in whole, if this was the only episode between the two parties. And there wasn't a course of conduct that had identified how they would treat one another. Partial performance could give rise to the entire contract. In this case, it would not. Because clearly mobilization was always, in fact, the testimony. And I believe in the record is that he wouldn't even charge for mobilization on the other jobs. But they did those. And we've always said and we've always said we're going to pay him for the mobilization with respect to that work. The issue is what contract. We are not taking the position that our request of them to do mobilization doesn't give rise to a contract to pay for the mobilization. It's either a contract. This is a meeting of the minds as to what the scope of the work is and what we're going to get paid for. Or it's an enforceable promise under promissory top. Under the theory. The point, however, is whether there is an enforceable promise from RQ that whether RQ ever made the promise that guaranteed accelerated would complete this project at any time. How do you explain the testimony that RQ communicated its intent to, quote, go with and, quote, accelerate? The second first that that item is what I would refer to as a general promise. It's no different than saying to someone, we're going to go forward with you on you mowing the lawn. We're going to go forward with that. That doesn't change the fact that it's just a general commitment. It is not a meeting of the minds on the terms of the agreement. What is the objective? What is the objective intent of the parties? In this particular case, the four parties knew that the contract that there was going to arise was going to have the termination for convenience provision in it. But if you just take a step back, what this relationship was from the very beginning and what it was continuously was you pay for the work that you were going to do. And that was the arrangement the parties had always had. That was the arrangement that never changed. Eight fifty six didn't change that circumstance. I want to save some time. I think I've dealt with those. We've briefed those two particular issues with respect to Mr. Hines. And I'm just going to leave that with respect to the issues in the briefs. We know our burden is very high there. The issue is still there are certain levels of of an obligation of a district court on the role of being a gatekeeper, where you keep out information even from a bench trial that doesn't rise to the level of rational evidence. And no foundation in this case for this man's evidence and for his opinion. We've explained the facts in our paper. I'm not going to go forward with it any further. And we commend our briefs to you and on various issues. Thank you. Thank you. They please the court. My name is David Goli and I represent Mr. William Porges, sole proprietor doing business as Accelerator Electric. He was the electrical subcontractor for our queue before getting to the issues of the facts. The standard of reviews is a big issue here. I think what our queue is contending is that this court make a de novo review of Judge Gonzalez's factual finding. Well, we have to be firmly convinced that it was wrong. I mean, I think that's right. But but I think your ruling makes a fairly forceful argument that when you've got a force of dealing involving four prior deals, each of which started with the same letter of intent, each of which had a contract that was in the same identical form, including the termination for convenience clause, that it just has to be wrong that this the fifth letter of intent, which says it's their present intention to issue the contract, is the contract. Yes, sure. Why isn't that just sort of obviously wrong? Let me explain, Your Honor. The standard of review is clearly erroneous because it was wrong. Oh, exactly. And the court made a factual finding on the issues the court's referring to now with the evidence, all the contracts, all the previous contracts, all the previous letters of intent. So Judge Gonzalez took all of that in consideration. It's not like she ignored it. There's a second thing that's missing here. In the industry, it's not necessarily the case every time that a form subcontract follows a letter of intent. It is very normal in the industry. In fact, John Elliott, one of the biggest figures in construction in San Diego, 40 years of experience of general contracts, said, and Berg Electric's guy, Mr. King said, who was the person that took over the contract. They said that it is very normal to submit a bid. They accept a bid. You go to work and they issue a letter of intent. That's an obligation to proceed. Now, what happened here that cut off the normal course of conduct that RQ would like us to throw back into the picture is their own action. On September 3rd, they improperly terminated our deal. So what they're saying then is, look, in the past, we've entered in this subcontract and we want that to be the deal. And if that's not signed, you have no deal. In the meantime, they don't say that in the past four deals, after the letter of intent, they improperly terminated their contract, their deal. There's nothing between the parties that says that a letter of intent is not itself a contract. Yes, a subcontract, a more formal subcontract, can later be signed that incorporates the standard terms in the industry, liquidated damages, attorney's fee clause. That does not mean, however, that that later formal subcontract has to be done for the parties to have a contract to begin with. Contract in construction can be created by a simple offer, a bid, and their acceptance. It can be oral. The statute of frauds doesn't apply to construction contracts. Isn't it pretty clear that the parties anticipated a written formal document here? The the letter of intent requests at the end certain preliminary documents, including insurance certificates, financial stability information and contractors licenses. If there's already a binding contract by virtue of the letter of intent itself, what what does it matter if if accelerated is not licensed, not insured and broke? If you've already got a broke, if you've already got a binding contract, if this letter of intent is a binding contract. Why why why do you have a request for that information? Actually, Your Honor, we addressed that at trial, the issue of insurance and various other documents. In fact, a couple of the witnesses testified and it was Mr. Patterson, their third in charge, and Mr. Quinn, their number one guy. They testified that, yes, our letters of intent tell you that you're obligated to the job, but you have to give us certain documentation. They called it a certain criteria. Insurance documents, submittals, shop drawings and and and those sorts of documents. We then presented into evidence those very same documents. And I said to those witnesses, are these the type of documents you're referring to in the letter of intent? There's certain criteria. And the witnesses said, yes, are these you ever look at these documents? Now, we never really saw them. They came to our office at some point and they said they didn't really matter. And that's not why we terminate it. That's not the reason. In fact, in exhibit in the September 3rd letter, it's exhibit. Pardon me. In September 3rd letter written by, I believe, Mr. Patterson, pursuant to our recent discussions, we have determined not to issue your firm a subcontract above reference project. Please stop work, demobilize the site immediately and send us your invoice for costs incurred to date. Never in that letter, as you say, we are terminating you because you didn't submit the documentation. That wasn't the issue ever. And I'm not asking about questions of breach. I'm not suggesting that accelerated breach to contract. It just seems to me that as you look at all of the language, the preliminary nature of the language, that it was intended that something more was going to be required before the parties, in fact, had a deal. I think the court is correct on that. But we proved to Judge Gonzalez that, in fact, those things did happen. We did submit insurance documents. We did submit shop drawings. We did mobilize. We did incur costs. We actually took away temporary power. We worked on the home runs. We had job site walks and meetings, et cetera. And their own superintendent even said he kept a log as to the hours worked by Mr. Porges and his people on the site. So all those things actually occurred. But as it turned out, and that's why Judge Gonzalez says that the letter of intent itself exhibits a present intent to contract, and it had the essential terms, scope, work, price, all the essential terms of the contract. And more importantly, the party's conduct after that letter of intent proved that there was a deal. The fact that a subcontract, formal subcontract, wasn't signed later doesn't trump the fact that the contract existed. At that point in time, the formal subcontract, all it does is confirm what already happened and throw in all the standard industries in the party's deal. And the reason why that's important to our cue is because they would like to take advantage of the termination for convenience clause that's in the contract. Why is the termination for convenience clause there to begin with? It originated from the Federal Acquisition Regulations. The government created that statute in the FARS because it was running out of money on projects, and they wanted to terminate for their own convenience at will projects that it was running out of money on. What general contractors have done in the industry is they then flowed through that provisions for subcontracts so that they're not left on the job with terminated for convenience work that they are now bound to the subcontractor for. That's all that termination for convenience provision was intended for. That's all it's used for. The government did not terminate for convenience. In fact, it did not only 856 but all three projects through Berg Electric. Nothing was terminated. The fact here is this. The contract was, in fact, entered into. Berg Electric, on August 3rd, submitted a $200,000 more favorable bid. That's what happened here. Now, on September 1, the parties, Mr. Porges and all the people from our queue, had a meeting at their office, and they focused on these bad comments made by Mr. Ryan Frosdale, who said, you guys are buying trucks on this job site with our money. You're not paying us. They allegedly took offense and two days later terminated them after Mr. Porges wrote a letter saying, we want to do the jobs. I'm glad for our frank meeting, but we want to do the work. But they sent a letter right after that saying, you're terminated, essentially. The effect of it was a termination. The real reason they terminated is because they got better price from Berg Electric. And our queue will now sit here and say, look, if the termination for convenience is in place and the subcontract is in place, all they're entitled to is their cost to come on the job. That's maybe true for our sort of cavalier attitude about damages may be true for our queue constructions world. But in Mr. Porges' world, where he's doing one to two million dollars of work a year maximum, these jobs meant everything to him. He geared his entire operations for these three jobs. This is what he lived for. These three jobs. He does only federal work. He does mostly BQs, BEQs. If you say to him, well, I'm going to give you a contract, and he gears his entire operation for these contracts. And then you say, well, you know what? We're going to take you off now because we've got a better offer. You are destroying his business. And this is why our cross appeal is important. We're saying that not only are we entitled to the lost profits on 856, we strongly believe that it is a very short leap of faith for this court to go further and say, you're also entitled to the lost profits on 852 and 855 because. Even in the absence of any letters of intent, because those projects had not been awarded by the Navy at that point in time? Very important question. That's the central issue, Your Honor. I'm glad the court raised it. The government required RQ to submit bids for all three projects. It's a package deal. The only dangling issue is whether the government exercises the option to go with those jobs. Once the bids are submitted by RQ, they are committed to those jobs at those fixed prices. It's not a negotiated item. Government doesn't do anything by negotiation. My question is that you're asking us to reverse the district court's finding that because of the fact that the government contracting officer had not let those contracts, that you are nonetheless entitled to all of your lost profits on contracts that RQ had not even been awarded yet by the government. For this reason only. When RQ, excuse me, when William Porges submitted his bid, he submitted a bid for three projects, all three PQs. He gave a volume discount with the understanding that once he submits the bid for all three projects, he is bound. The only thing left to do is for the government to exercise the options of the second and third and for RQ to then flow that option downhill. It wasn't RQ's decision to make. He stuck by his price. There's no turning back. In fact, the government did let out those contracts when Berg took it over. It happened after the termination, that's true. But in fact, it was all in place by my client, Mr. Porges. So what I'm saying is although the act of exercising the option of the government didn't occur by September 3rd, 1999, that is true, it was all set in place for that to happen. And more importantly, the volume discount that our client gave to RQ, and therefore the government, took in consideration that possibility. So when we get only lost profits to one project, in effect my client is now damaged in a way because he has anticipated three projects that he could make three times that or two and a half times because the third BQ is half of a BQ in essence. The problem, Lydia, is that either the letter of intent is the contract or it's not. Yes, Your Honor, but that sidesteps one other issue. We are not saying that we're entitled to the lost profits damages on the letter of intent for the second and the third BQ. We are saying we're entitled to those under the theory of promissory estoppel, which as Kojima, the Supreme Court case, expanded the rights of contractors in the construction setting. You substitute a missing contract with a promissory estoppel. There's a promise, there's reliance, volume discount, actions to go forward. How would that have come out in the Warsh in your lost profits? I'm sorry, Your Honor, I didn't. How would that not have come out in the Warsh when you presented lost profits on 8, whatever, 8, uh, 856? Because our lost profits for 856. You're being judged for that, right? I mean, to the extent that you gave them a quantity discount when you're pursuing lost profits on 856, then why wouldn't you have included what you really would have charged if your bid had only been on 856 in measuring lost profits? Because we were going under two theories of recovery, the breach of contract for the letter of intent and the conduct supporting the letter of intent for 856. And that was 23.22 percent, percent profit that Mr. Heisman found. There is an additional 23.22 percent on the 852, excuse me, 855, and then half of that on 852. We, if we had bid only 856, our profit would have been much higher than 23.22 percent. So when we made our claim, we made it under a breach of contract claim and then separated the lost profit claims from the promissory stop vote because the letter of intent addressed 856 only, but the parties contemplated all three projects. And Mr. Porteous was stuck in doing all three projects if things had gone forward the way they did with Berg Electric. And I would just remind the Court that Berg Electric made 36 percent profit on the project. So 36 percent profit on one, one BQ, then made it again on the second BQ and then made half of that on the third BQ because the third BQ is half. So our position is that we step in the place of Berg Electric, in effect. If this hadn't happened, if they hadn't gotten this better bid, then they would, they would have given us, allowed us to go forward, finish the job. The options would have been then exercised by the government and then we do the rest of the BQs and we get the profit on two and a half projects. By their termination letter, they prevented us from following through on everything that was contemplated. It's just that the second and third BQs lost profits are recoverable under promissory stop vote because that is a substitute for the contract that didn't exist on those two projects. But contemplated by the promise and justifiable reliance of our client. And then the last issue, of course, that the $21,000 issue on Mr. Heisman analysis for lost profit on 856, of course, if that goes up, if the Court analyzes that and says the $21,000 should have been part of 856 and the Court awards us the lost profits on 855 and 852, then those analysis get changed upwards as well. Would the Court like me to get into the $21,000 issue for a few minutes? I don't need any argument. Your briefs were pretty clear. All right. Thank you. Then that's all I have. Thank you very much. I am always troubled when the issue turns to motive under a contract as opposed to the facts of the arrangement that took place here. I need to remind the panel. Mr. Galea has made an argument that through inference that essentially the reason that Mr. Porges was denied his contract in this case is because our cue was bid shopping. The district read the findings of the district court and read the transcript. In fact, when I was making my closing argument, I was starting to raise the facts with respect to with respect to, quote unquote, bid shopping. Judge Gonzales raised her hand, said, Mr. Smolin, you don't even have to touch it. There are no such facts. I'm paraphrasing the gist of it. The fact of the matter is that the bid that had come in from Berg Electric, we had it. It was after that bid that the words, we're going to go with Mr. Porges were made and which ultimately gave rise to the contract. So there's no shopping here. In fact, with respect to the issue of promissory estoppel and the other two contracts, options are options. The option not only was for the government, the government had an option not to give dark. You had an option to hire anyone else. We had the same option. The fact that we had an option that he bid the three, we always had the option to hire someone else. There's nothing in the federal acquisition regulations that prevented RQ from exercising its right to hire anyone it wished for the second contracts. The I want he made reference to the Kojima case and there are three cases. But before you get to Kojima, was there evidence that the bid submitted by Accelerated was conditional on the award of all three? The argument I heard from opposing counsel was that they gave you a volume discount. It was not conditional on all three of his getting all three. You got one bid and said for the electrical work, here's what we'll charge. That's right. Here's what we'll charge for a here's what we'll charge for B. Here's what we'll charge for C. I need to make reference to Kojima and Drennan and one other case. They are completely inapposite here. Those are California state promissory estoppel cases enforcing the California public contract code. And there are two elements of the California public contract code that do not exist in this case, do not exist under the federal acquisition regulations. And in fact, the policies under the federal acquisition regulations are the direct opposite of what is the policy of the state of California. And the state of California has a provision in it that you must that the state must award to the lowest responsible bidder. And there are requirements that if a subcontractor whose bid is I think it's one and a quarter percent or one quarter percent of a certain amount must be listed as the actual subcontractor to get the job. It is those two facts that are the primary facts, both in Kojima and Dresden and Drennan and the other cases that drive the finding of promissory estoppel in those cases. In fact, the court was very troubled about whether they should even give promissory estoppel in those cases because there is another remedy under the California state contracting code, which is to protest the. Decision of the of the awarding authority. And so the. Those cases are an apposite. They don't apply. They also don't even deal with options at all, which is what the issue is here. Options. The next issue with respect to the it's a clearly erroneous standard for Judge Gonzalez's decision with respect to her findings that there was no promise with respect to 855 and 852 and that there was no promise, no reliance with respect to 855 and 852. The essential issue really in this case was what was the arrangement of these two parties and the conduct of those two parties for the year and a half and the two years beforehand. With respect to how they negotiated with one another and what that course of conduct demonstrated and and what was the promise that was made by our queue in each of those circumstances. We're here to enforce a promise. Our position is and we think it's clear from the course of conduct of the parties that the promise was will pay you for the work that you do. And that was the essence of the agreement all along. And we're asking the court to enforce that promise. And the letter of intent did not create any different promise. With respect to that, we're asking for remand and to have the district court make a ruling with respect to the amount of work that was actually done, the cost of mobilization, etc. And what that would be. We also submit that those numbers are actually in the record. There was testimony about that amount. I think it was twenty thousand dollars. We disputed that on several points. But you can either remand or if you agree with us, you can either remand or you could make a decision on your own as to what the actual amount of the cost. Reasonable cost would be either would be appropriate. Assuming your decision is as we request. I have no further point. Thank you. Matter just argued will be submitted.
judges: Rymer, Tallman, Leighton